## IN THE CIRCUIT COURT OF HAMILTON COUNTY, TENNESSEE

JOHN S. WILSON,

    Plaintiff,

v.

XIANT TECHNOLOGIES, INC.

    Defendant.

DOCKET NUMBER: 18C1035

DIVISION:

JURY DEMAND

FILED IN OFFICE
2018 SEP 14 PM 3:36
LARRY L. HENRY, CLERK
BY _____ DC

---

## COMPLAINT

---

Comes the Plaintiff, John S. Wilson, by and through counsel, and brings this Complaint for damages against Xiant Technologies Corporation for breach of contract. In support of his cause of action, Plaintiff John S. Wilson states as follows:

### PARTIES AND JURISDICTION

1.    Plaintiff John S. Wilson was, at all times relative to the Complaint herein, a resident of Chattanooga, Hamilton County, Tennessee.

2.    Defendant Xiant Technologies is a company located in Greeley, Colorado.

3.    Upon information and belief, it is believed that Jason Suntych, a Colorado resident, is the Chief Operating Officer ("COO") of Xiant Technologies, Inc. (hereinafter "Xiant"). Jason Suntych is a co-founder and Director of the corporation and has been described as the "Liaison to the CEO" in formal materials disseminated by Defendant Xiant.

4.    The contract herein called for the Plaintiff to provide services for the Defendant in Hamilton County, Tennessee.

## GENERAL ALLEGATIONS

5.     This lawsuit arises out of a contract, or series of contracts, which were entered into no sooner than August 1, 2017, in Chattanooga, Tennessee and which Defendant subsequently breached.

6.     Plaintiff, a former investment banker, is a highly regarded financial commentator and author whose work has included guest appearances on national television programs and a subscription-based investing blog with nationwide membership.

7.     Jason Suntych, as co-founder, director, and Chief Operating Officer ("COO") of Defendant Xiant, possessed actual and apparent authority to act on behalf of Xiant.

8.     Jason Suntych, acting on behalf of Xiant as Chief Operating Officer, contacted Plaintiff Wilson at Plaintiff's Chattanooga, Tennessee residence on or about August 1, 2017, and solicited Plaintiff's assistance in advising them as to a company or legal entity interested in purchasing, investing in and/or using technology created by Xiant and/or its subsidiaries.

9.     Defendant Xiant had developed state-of-the art, albeit unproven LED light technology. Defendant's technological developments were initially subject to small controlled tests that demonstrated phenomenal results, including increased poultry growth rates while simultaneously reducing energy consumption and feed required for chickens.

10.    While Xiant had successfully pursued private fundraising in the Colorado area and initiated limited testing of its technology, Xiant's research and development was expensive, and Xiant lacked the cash to fund large scale trials and testing needed to validate the company and its technology.  In short, Xiant lacked the funds to prove that its results in small, controlled trials of caged birds could be replicated in real-world applications on a large scale.

11. Xiant's early trials caught the attention of analysists at a Fortune 500 company based in Chicago.

12. Xiant ultimately failed to secure any investment or paid test from the Chicago company, but the experience led Xiant's leadership to the conclusion that they were ill-quipped to handle courtship by a Fortune-500 company, much less any other company seeking to pursue any large-scale trials or testing of Xiant's technology. Indeed, Xiant had yet to even decide if it would manufacture hardware incorporating its technology or whether it would position itself as a technology licensor. In any event, these conclusions precipitated Xiant's further contact with Plaintiff.

13. Xiant was aware of Plaintiff Wilson's expertise and shortly after Plaintiff Wilson became involved in the financial valuation of the company, Xiant and Plaintiff Wilson concluded that all valuation would be largely dependent on the company's ability to obtain large scale trials to prove the merits of its technology. Consequently, Xiant also solicited Plaintiff's services to help identify and secure additional fundraising sources, with an emphasis on procuring large-scale trials funded by a large industry player.

14. Plaintiff's source of compensation for services was contingent in nature, as Xiant ultimately promised Plaintiff a five percent (5%) finder's fee for any business opportunities made available to Xiant through Plaintiff's efforts. Plaintiff agreed to and worked under these terms on a regular basis for over one (1) year.

15. Following the agreement between Xiant and Plaintiff to use Plaintiff's expertise in locating a potential user or licensee of the technology developed by Xiant, the Plaintiff proceeded to perform the essential elements of the agreement necessary to locate a potential user or licensee.

16.     After a meeting in Greeley, Colorado, attended by Daren Suntych, Jason Suntych, Wilson and Napoleon Overton, numerous emails and telephone calls were exchanged between Plaintiff in Tennessee and Jason Suntych in Colorado soliciting Plaintiff's efforts to connect Xiant with a potential buyer of Xiant's technology in exchange for a five percent (5%) finder's fee which ultimately resulted in a contract between Xiant and Cal-Maine Foods, Inc. (hereinafter referred to as "Cal-Maine"), one of the world's largest poultry and egg producers headquartered in the State of Mississippi.

17.     Consistent with the contract, Xiant provided Plaintiff a business card connecting him with Xiant Technologies.  The contract between the Plaintiff and Xiant was similarly confirmed by written emails and numerous verbal conversations on various occasions between the parties.

18.     Plaintiff would show that Defendant Xiant, by and through its authorized corporate officer and liaison, Jason Suntych, made certain promises to the Plaintiff who relied to his detriment on said promises by successfully performing all tasks assigned to him.  Specifically, the Plaintiff was able to make initial introductions between Xiant and Cal-Maine based upon his extensive personal and business contacts and relationships.  Plaintiff's introductions gave credibility to Xiant and opened the door to further discussions with top-tier officials at Cal-Maine.

19.     Plaintiff arranged Xiant's initial meeting with Cal-Maine, which occurred in Wichita, Kansas on November 2, 2017.  Less than a year after the Wichita meeting, Cal-Maine and Xiant entered into a multi-million dollar contract for Xiant's technology, which far exceeded Xiant's initial hopes of simply obtaining financing for large-scale testing.  Plaintiff Wilson's success also put the Defendant in position to close a massive equity deal that could equal or exceed all equity investments made prior to Plaintiff's involvement.

20.     The introduction of Xiant to Cal-Maine has been acknowledged by Xiant which, prior to said introduction, had no contact whatsoever nor knowledge of Cal-Maine's potential interest in the Xiant technology. In other words, Plaintiff Wilson put Defendant Xiant on the map, and put it in a position for both maximum exposure and maximum valuation when Xiant had demonstrated an inability to close business deals with other key industry players.

21.     The Plaintiff would respectfully show that his finder's fee contract entitled him to five percent (5%) of the amount of any contract entered into between Xiant and Cal-Maine, including, but not limited to, provisions of the future executory or contingent provisions of said contract. Specifically, the Plaintiff would show that Cal-Maine paid Xiant Technology $4.5 Million in exchange for a certain percentage of the company with a contingent warrant to exercise an additional purchase of $4.5 Million for a total deal value of $9 Million.

22.     Based upon the contractual obligations of Xiant and Wilson which involved the five percent (5%) finder's fee in favor of Plaintiff, Plaintiff is entitled to a fee of $225,000.00 for the August 2018 agreement between Cal-Maine and Xiant in addition to $225,000.00 when the contingent warrant is exercised on or before June 1, 2019.

23.     The Plaintiff would show that Xiant improperly and illegally breached the verbal, written, and/or implied contract with Wilson after having previously acknowledged all aspects of their contractual obligation and is estopped from denying the existence of said contract.

## COUNT I
## BREACH OF CONTRACT

24.     Plaintiff realleges and incorporates all allegations in paragraphs 1-23 as if fully set forth herein.

25.     The Defendant has materially breached its obligations under the written and oral contract with Plaintiff John Wilson.

26. The Defendant ultimately repudiated the agreement with Wilson after negotiations led them to believe that rather than a lower sum of money involving the contract with Cal-Maine would be substantially higher ($1.5 Million to $9 Million). After a deal was agreed upon with Cal-Maine, Defendant forwarded a contract to Plaintiff which sought to limit Plaintiff's compensation to $25,000.00. The Defendant further acknowledged Plaintiff's entitlement to a 5% finder's fee when Defendant discussed a $75,000 commission when it appeared Cal-Maine might invest $1.5 Million.

27. Defendant never refuted the terms discussed in extensive correspondence and communications between the Parties over the course of more than a year.

28. Plaintiff, realizing the potential of Xiant's technology, and leaning on his extensive personal and business connections, obtained an audience with the CEO and COO of Cal-Maine.

29. Xiant and Cal-Maine executed a formal agreement valued in the amount of at least $9 Million on or about August 10, 2018.

30. Notwithstanding the fact that Plaintiff put the Defendant in a position to ultimately secure a contract valued at $9 Million or more with Cal-Maine, the Defendant has defaulted on their payment obligations under the subject contract with Plaintiff.

31. Defendant was unknown to Cal-Maine prior to Plaintiff's involvement, which is plainly evidenced by the fact that all correspondence between Cal-Maine and Xiant was initiated by Plaintiff, who made initial introductions after more than several months of work and who has continued to work on behalf of Xiant weekly, if not daily, fore more than one (1) year.

32. Xiant was able to secure a lucrative deal with Cal-Maine as a direct result of Plaintiff's efforts. Defendant's failure to compensate Plaintiff is especially egregious in light of Defendants inability to secure investment from a Fortune 500 company before Plaintiff's efforts.

33. The Plaintiff has made a written demand to the Defendant to fulfill their payment obligations on more than one occasion, but Defendant has failed to compensate Plaintiff as agreed.

34. As a proximate result of the Defendant's material breach of the contract, the Plaintiff has suffered damages in the amount set forth herein.

35. Pursuant to the terms and obligations of the contract, the Plaintiff is entitled to full and immediate payment of the five percent (5%) finder's fee.

**COUNT II**
**BREACH OF ORAL CONTRACT / CONTRACT IMPLIED IN FACT**

36. Plaintiff realleges and incorporates all allegations in paragraphs 1-35 as if fully set forth herein.

37. Pleading in the alternative, to the extent a Court may find that the vast electronic correspondence between Plaintiff and the Defendant does not create an express contract, Plaintiff would aver that it entered into an oral contract agreement with Xiant co-founder and Chief Operating Officer, Jason Suntych, who was acting on behalf of Defendant Xiant.

38. Jason Suntych had actual authority to act on behalf of Xiant by virtue of his status as co-founder, director, and Chief Operating Officer and "primary liaison to the CEO regarding issues such as venture capital funding, scientific trials, and general business strategies" according to Xiant's "2018 Executive Summary."

39. Defendant Xiant provided Plaintiff with a business card which further evidences the contract Plaintiff formed with the Defendant.

40. Xiant, through its Chief Operating Officer Jason Suntych, repeatedly solicited Plaintiff's services and directed Plaintiff to make contact with Plaintiff's nationwide network of agribusiness executives in an effort to land an all-important deal to infuse cash into the fledgling company that was big on ideas but short on operational cash flow.

41. Xiant, through Jason Suntych, repeatedly assured Plaintiff that he would be compensated a reasonable five percent (5%) finder's fee as set forth previously herein.

42. Xiant never objected to the Defendant's offer for a five percent (5%) finder's fee to Plaintiff. Plaintiff was always encouraged to continue with his efforts through and until August of 2018, when Xiant closed a deal worth $9 Million or more with Cal-Maine.

43. Xiant's Chief Operating Officer, Jason Suntych, acknowledged Plaintiff's pivotal involvement with Xiant's $9 Million Cal-Maine agreement. Specifically, in an August 10, 2018, email, Jason Suntych advised that the deal had closed and also noted: "thanks for the introduction."

44. Because Xiant co-founder, director, and COO Jason Suntych was acting for Defendant Xiant under both actual and apparent authority, all representations, confirmations, and inducements made by Jason Suntych on behalf of Defendant Xiant form the basis of a contract as memorialized by the extensive and frequent course of dealings between the Parties over the course of more than one (1) year.

45. Defendant has breached its contract with Plaintiff to the extent that, post-closing of the $9 Million Cal-Maine deal, the Defendant has now circulated a written agreement purporting to limit Plaintiff's compensation to $25,000, which is inconsistent with all previous representations the Defendant made to Plaintiff with respect to Plaintiff's efforts. Pursuant to the terms and obligations of the contract, the Plaintiff is entitled to full and immediate payment of the five percent (5%) finder's fee to be applied to Xiant's recently executed a contract with Cal-Maine and valued at least $9 Million. Plaintiff's finder's fee applies to this amount.

## COUNT III
## BREACH OF CONTRACT IMPLIED IN LAW/ UNJUST ENRICHMENT/QUANTUM MERUIT

46. Plaintiff realleges and incorporates all allegations in paragraphs 1-45 as if fully set forth herein.

47. Pleading in the alternative, to the extent a Court may find that the vast electronic correspondence between Plaintiff and Defendant does not create an express contract or a contract implied in fact, Plaintiff would aver that a contract implied in law exists in that Plaintiff conferred a benefit upon the Defendant that was appreciated and accepted by the Defendant, and that it is inequitable for the Defendant to retain the benefit without payment of the value promised.

48. Defendant solicited the services of the Plaintiff for purposes as herein set forth.

49. Plaintiff recognized the synergies that Xiant's technology could afford to Cal-Maine's operations. Plaintiff worked consistently for several months to secure an audience with Cal-Maine, and Plaintiff's persistence paid dividends for Xiant as the Plaintiff's efforts were the procuring cause which produced a lucrative contract with Cal-Maine.

50. Defendant has breached their contract with Plaintiff to the extent that, post-closing of the $9 Million Cal-Maine deal, the Defendant has now circulated a written agreement purporting to limit Plaintiff's compensation to $25,000, which is inconsistent with previous representations Defendant made to Plaintiff. Pursuant to the terms and obligations of the contract, the Plaintiff is entitled to full and immediate payment of the five percent (5%) finder's fee to be applied to Xiant's recently executed a contract with Cal-Maine. Plaintiff's finder's fee applies to these amounts.

51. The Plaintiff has made a written demand to the Defendant to fulfill their payment obligations on more than one occasion, but the Defendant has failed to compensate Plaintiff as agreed.

52. Defendant's failure to compensate Plaintiff for his extensive efforts amounts to Unjust Enrichment.

53. Plaintiff would also be entitled to recover under a Quantum Meruit theory in the event there is an implied contract.

## COUNT IV

## PROMISSORY ESTOPPEL

54.     Plaintiff realleges and incorporates all allegations in paragraphs 1-53 as if fully set forth herein.

55.     Pleading in the alternative, to the extent a Court may find that the vast electronic correspondence between Plaintiff and Defendant does not create an express contract or a contract implied in fact, Plaintiff would aver that the Defendant made an unambiguous promise of compensation to the Plaintiff and that Plaintiff relied on that promise to his detriment

56.     Defendant promised Plaintiff they would compensate him a finder's fee of five percent (5%) as set forth herein in paragraph 8 and beyond.

57.     Plaintiff agreed to Defendant's terms and began working in earnest with Plaintiff's various and extensive efforts for several months, which resulted in a lucrative contract with Cal-Main, and Defendant has acknowledged that this deal was procured by Plaintiff.

58.     Plaintiff remains unpaid for his extensive services, to which Plaintiff dedicated himself over one (1) year.

59.     Plaintiff was continually encouraged and induced to continue his efforts on behalf of Xiant and was given documents consistent with those inducements.

60.     Plaintiff relied to his detriment on Defendant's promises that he would ultimately be compensated for his extensive efforts by dedicating more than one (1) year of his professional time, yet was not compensated consistent with his understanding that he would be offered a five percent (5%) finder's fee. Xiant co-founder, Chief Operating Officer, and director Jason Suntych repeatedly affirmed that a five percent (5%) finder's fee and induced Plaintiff to put forth his best efforts to advance Defendant's goals.

61. Defendant's inducement of Plaintiff's efforts and subsequent refusal to pay Plaintiff for his services amounts to promissory estoppel. Consequently, Defendant is estopped from denying the existence of their agreement with Plaintiff, to which the Defendant has derived tremendous financial benefit.

## COUNT V
## ACQUIESCENCE

61. Plaintiff realleges and incorporates all allegations in paragraphs 1-60 as if fully set forth herein.

62. Pleading in the alternative, to the extent a Court may find that the vast electronic correspondence between Plaintiff and Defendant does not create an express contract or a contract implied in fact, Plaintiff would aver that Defendant acquiesced to the terms of compensation they proposed on many occasions via in-person, telephonic, and email communications when the issues of compensation were discussed by not raising or challenging the Plaintiff's belief about his forthcoming payment and allowing him to continue to work under those beliefs about compensation.

63. Plaintiff made many references to his compensation and to wanting to formalize the agreement with the Defendant after the email offer of a 5% finder's fee for any paid trials that came to Xiant through the Plaintiff's efforts, and these references were met with silence, inaction, and further discussion that only served to spur the Plaintiff on to more work on behalf of the company.

64. All verbal communication between the parties indicated to Plaintiff that his fee for a successful culmination to the Cal-Maine deal would be 5% of Cal-Maine's commitment.

65. Chief Operating Officer Jason Sunytch stated to Plaintiff that "$75,000 would be a pretty nice fee" when it initially appeared that Cal-Maine would be putting up $1.5 million in the agreement. Plaintiff agreed in as much as that amount represented 5% of the deal initially proposed.

66. Once the agreement reached the $9 million mark, all attempts by the Plaintiff to discuss and document his 5% fee were met with silence on that topic, promises to review his emails, and excuses for not being available for discussions.

67. Defendant's actions and inactions amount to their actual, tacit or passive consent to the 5% finder's fee as the agreement with Cal-Maine evolved and grew to a $9 million dollar deal.

## COUNT VI
## PUNITIVE DAMAGES

68. Plaintiff realleges and incorporates all allegations in paragraphs 1-67 as if fully set forth herein.

69. Plaintiff avers that the Defendant acted intentionally, fraudulently, and/or recklessly in denying him the agreed upon fee for his services.

70. Plaintiff avers that Defendant's actions were intentional in that they consciously engaged in the contract by suggesting the 5% finder's fee, by affirming its validity and/or acquiescing to it as the deal evolved and progressed to induce the continued work of the Plaintiff, and then intentionally repudiated the deal and refused to pay the agreed upon compensation to the Plaintiff.

71. Plaintiff avers that Defendant's actions were fraudulent in that the Defendant produced a false impression that the 5% finder's fee was applicable to the Cal-Maine Deal at all times, including initial negotiations with Cal-Maine when the estimated investment was to be $1.5 million dollars. Later, when the investment increased to $9 million dollars, the Defendant dodged the direct inquiries from the Plaintiff about the deal, his compensation, and ultimately repudiated the deal. This had the effect of giving the Defendant an unfair advantage by allowing them to close a lucrative deal procured by the Plaintiff, while allowing Cal-Maine to believe that the Plaintiff and

Defendant were still working together until after the deal was closed. The Plaintiff relied upon these fraudulent assertions and was ultimately injured by them.

72.     Plaintiff avers that the Defendant's actions were reckless in that the Defendant was aware at all times of the Plaintiff's belief in the contract and his reliance upon it, and the Defendant consciously disregarded the substantial and unjustifiable risk to the Plaintiff as he kept working under the assumption of receiving 5% of the Cal-Maine deal once it was completed, without informing him that they had decided to repudiate the contract and offer a mere $25,000 instead. This constituted a gross deviation of the standard of care that an ordinary person would exercise under these circumstances.

73.     Defendant's actions and inactions were intentional, fraudulent, and/or reckless, the Plaintiff relied upon the Defendant's assertions, and was injured in an egregious way. Plaintiff avers that punitive damages are appropriate in this case.

**WHEREFORE**, Plaintiff prays as follows:

a)   That process be issued and the Defendant be served with a copy of this Complaint and Summons;

b)   That John S. Wilson be awarded judgment for damages in the amount of $225,000.00 regarding the immediate breach of contract for the damages existing presently and an additional $225,000.00 upon the exercise of the warrant by Cal-Maine;

c)   That, in addition to praying for the full and immediate payment of the outstanding balance of the requested relief, Plaintiff be awarded punitive damages in the amount of One Million dollars ($1,000,000).

d)   Plaintiff demands a jury to try the issues when joined.

e)   For such other and further relief which the Court deems just and proper.

Respectfully submitted,

LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC

BY: _____

| | |
|---|---|
| **GARY S. NAPOLITAN** | BPR No. 001691 |
| **WILLIAM C. KILLIAN** | BPR No. 002425 |
| **ANDREW J. GODBOLD** | BPR No. 031134 |

Tallan Building – Suite 500
200 W. ML King Blvd.
Chattanooga, TN 37402-2566
(423) 265-0214 – Phone
(423) 266-5490 – Fax
*gary.napolitan@leitnerfirm.com*


BERKE, BERKE & BERKE

By: _____

| | |
|---|---|
| **Marvin B. Berke** | BPR No. 1740 |
| **Erin V. Wallin** | BPR No. 036240 |

Attorneys for Plaintiff
420 Frazier Avenue
Post Office Box 4747
Chattanooga, Tennessee 37405
(423) 266-5171 - Telephone
(423) 265-5307 – Facsimile
*marvin@berkeattys.com*
*erin@berkeattys.com*

14