# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### CHATTANOOGA DIVISION

| | | |
|---|---|---|
| JOHN W. WILSON, | ) | |
| | ) | |
| *Plaintiff,* | ) | NO. 1:18-CV-00243 |
| | ) | REEVES/LEE |
| v. | ) | |
| | ) | |
| XIANT TECHNOLOGIES, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant has moved to dismiss this case for lack of personal jurisdiction, or in the alternative to transfer it to the District of Colorado [D. 13]. For the following reasons, the motion to dismiss for lack of personal jurisdiction will be granted, and to serve the interests of justice, the case will be transferred to the District of Colorado under 28 U.S.C. § 1631.

## I.    BACKGROUND

Plaintiff is a financial commentator and former investment banker who lives in Chattanooga, Tennessee. Defendant is a Delaware corporation with headquarters in Greeley, Colorado [D. 1-1, ¶¶ 1-2]. The relevant facts are as follows.[1]

Defendant produces state-of-the-art LED lights that poultry farmers can use to speed up animal growth, which reduces energy and feed costs. By 2017, preliminary tests of the grow lights had shown "phenomenal" results. But to successfully market its product and turn a profit, Defend-

---

[1] The alleged facts are found in the state court complaint at D. 1-1, ¶¶ 1-23. In addition, the parties have attached exhibits to their briefs, which the Court may consider in ruling on the jurisdictional question. *See* Section II, *infra*.

ant needed cash to conduct the necessary research and development that would validate the preliminary tests. It initially attempted to solicit investment for this purpose on its own, and had one meeting with a Fortune 500 company in Chicago.

After the meeting, Defendant realized it was ill-equipped to navigate the fundraising world. So Jason Suntych, Defendant's Chief Operating Officer, contacted Plaintiff through LinkedIn, a professional networking website [D. 16, ¶ 8]. Plaintiff conducted an initial financial valuation for the company, and traveled to Colorado to meet with Defendant's corporate officers. As compensation for Plaintiff's services, Defendant orally agreed to pay a five percent finder's fee for any business opportunities Defendant received through Plaintiff's efforts.

After the Colorado meeting, Plaintiff and Mr. Suntych exchanged "numerous" e-mails and telephone calls between Tennessee and Colorado. Mr. Suntych also spent one night in Chattanooga before a meeting with a potential investor, and the two men had dinner. Eventually, Plaintiff arranged a meeting for Defendant with Cal-Maine Foods, Inc., a poultry and egg producer with headquarters in Mississippi. Defendant then met with Cal-Maine—without Plaintiff being present—at a Cal-Maine facility in Wichita, Kansas on November 2, 2017. Within a year of meeting, Defendant and Cal-Maine entered into a "multi-million" dollar contract, and Defendant is now in position to close a "massive" equity deal thanks to Plaintiff's efforts.

Plaintiff now argues Defendant has not paid the agreed-upon finder's fee, and that he is legally entitled to his slice of the Cal-Maine deal. He filed suit in the Circuit Court for Hamilton County, Tennessee on September 14, 2018, bringing claims arising from the alleged breach of contract [D. 1-1]. The case was removed to this Court on October 11, 2018 [D. 1]. Defendant filed the motion to dismiss on October 26, 2018 [D. 13], and the matter is now ripe for decision.

## II. STANDARD OF REVIEW

A district court may dismiss a complaint for lack of personal jurisdiction upon motion of a party. Fed. R. Civ. P. 12(b)(2). Neither statutes nor the federal rules provide direction regarding the proper method of ruling on a jurisdictional issue, and "the mode of determination is left to the trial court," with the assistance of case law. *Serras v. First Tenn. Bank Nat'l Ass'n*, 575 F. 2d 1212, 1214 (6th Cir. 1989) (citation omitted).

The plaintiff always bears the burden of establishing that jurisdiction exists on a 12(b)(2) motion, and cannot rest on the pleadings alone to answer a movant's affidavits. *Id.* Instead, she must set forth, by affidavit or otherwise, "specific facts showing that the court has jurisdiction." *Id.* (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d. Cir. 1981)). A court may rule on the motion based on these written submissions; in so doing, it must consider the evidence in the light most favorable to the plaintiff.[2] *Id.* Thus, the plaintiff has the burden of making a *prima facie* showing that personal jurisdiction exists. *Id.* If she makes that showing, a motion to dismiss under 12(b)(2) should be denied, notwithstanding any controverting evidence presented by the moving party. *Id.*; *see also Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991).

"A district court may decide to rule upon the jurisdictional issue upon a full trial record, after an evidentiary hearing, or merely on the basis of a written record." *Kent v. Hennelly*, 328 F. Supp. 3d 791, 796 (E.D. Tenn. 2018) (citing *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir. 1980)). The plaintiff's burden is "relatively slight," and the affidavits in this case provide a sufficient record. Defendant's 12(b)(2) motion will be ruled on without a hearing. *See id.*

---

[2] Because the burden rests with Plaintiff, and the affidavits are construed in his favor, his motion to allow a sur-reply [D. 20] will be denied, and the briefs submitted under this motion [D. 21, 22] will not be considered. *See* Local Rule 7.1(d). Plaintiff argues the sur-reply is necessary because the affidavits filed by Defendant in support of its motion are inconsistent or misleading [D. 20, ¶ 1]. Even if this were true, it would not affect the outcome under this standard of review, where the evidence is already construed in Plaintiff's favor. The separate ground raised for the motion—that the case law cited regarding venue transfer is incomplete [*Id.*, ¶ 2]—is also unavailing. Plaintiff cannot submit an additional brief simply to cite legal authority that existed at the time the prior brief was filed.

### III. APPLICABLE LAW

This Court has subject matter jurisdiction because the parties are citizens of diverse states [D. 1, ¶ 3]. When a federal court sits in diversity, it may exercise personal jurisdiction over a defendant only if a court in the forum state could do so. So a court should first determine whether jurisdiction can be exercised under state law. If so, it must then determine whether the exercise of jurisdiction does not exceed the limits of constitutional due process. *Aristech Chemical Int'l Ltd. v. Acrylic Fabricators, Ltd.*, 138 F.3d 624, 627 (6th Cir. 1998). In Tennessee, jurisdiction is co-extensive with the limits of constitutional due process, so the two steps collapse and the Court must only determine whether its exercise of jurisdiction would fall within the constitutional boundaries. *Kent*, 327 F. Supp. 3d at 797 (citing *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001)).

These boundaries are shaped by the "traditional notions of fair play and substantial justice," which require a court to find that a defendant has established "minimum contacts" with the forum state. *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Jurisdiction comes in "two flavors": general and specific. *Kerry Steel v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997). Plaintiff concedes that a Tennessee court does not have general jurisdiction over Defendant (which requires "systematic and continuous contacts" with the forum state), so the discussion focuses on whether Plaintiff has the minimum contacts required for the Court to exercise specific jurisdiction [*see* D. 15, p. 3].

To demonstrate specific jurisdiction, plaintiffs must navigate a three-step test. *Means v. U.S. Conf. of Catholic Bishops*, 836 F.3d 643, 649 (6th Cir. 2016) (citing *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). First, the court must find a defendant has "purposefully availed" herself of the privilege of acting in the forum state or causing a consequence in the state. To assert jurisdiction, a finding of purposeful availment is "essential." *Id.*

(quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005)). Second, the defendant's contacts must "arise from" the operative facts of the controversy. *Id.* Finally, the defendant must have a substantial enough connection with the forum state to make exercise of jurisdiction reasonable; the court should infer that reasonableness is present when the first two factors are satisfied. *Intera Corp.*, 428 F.3d at 618 (citations omitted); *see also Southern Machine*, 401 F.2d at 384 ("once the first two questions have been answered affirmatively, resolution of the third involves merely ferreting out the unusual cases where that interest cannot be found").

## IV.   DISCUSSION

### a.   Purposeful Availment: Generally

The first (and essential) requirement of personal jurisdiction—purposeful availment—"ensures that a defendant will not be haled into a court solely as a result of 'random,' 'fortuitous' or 'attenuated contacts'" with the forum state. *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). A defendant is said to have "purposefully availed" herself of the forum state when the court finds she has a substantial connection or relationship with the forum state that invokes, "by design, the benefits and protection of its laws," and not a mere "collateral relation." *Id.* at 1300 (citations omitted). A "substantial connection" develops when the defendant engages in "significant activities" within the forum state, or creates "continuing obligations" with residents of the state. *Burger King*, 471 U.S. at 475-76; *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 900 (6th Cir. 2017). The focus should be on the quality, not the quantity, of the forum state contacts. *LAK*, 885 F.2d at 1301.

### b. Case Law

#### i. *Burger King*

The Supreme Court's decision in *Burger King* is the North Star that guides courts when evaluating purposeful availment in contract disputes. *See* 471 U.S. 462. In that case, Burger King, a Florida corporation, had entered into an agreement with Michigan residents who operated a Burger King franchise in Michigan. *Id.* at 466. The franchisees fell behind in their monthly payments to Burger King, and eventually Burger King terminated the franchise and ordered the franchisees to vacate the premises. *Id.* at 468. The franchisees ignored this order, and continued to occupy and operate the facility as a Burger King restaurant in Michigan. So Burger King sued the franchisees in Florida, alleging they had breached the franchise agreement and tortuously infringed on Burger King's trademarks. *Id.* at 468-69.

Addressing a circuit split over whether a contract is a "contact" for purposes of due process analysis, the Court found "substantial" record evidence supporting the district court's conclusion that the assertion of personal jurisdiction over the defendant in Florida did not offend due process. *Id.* at 478. To resolve the existing division in the circuits, the Court did not fabricate a "mechanical" rule or "conceptualistic" theory. *Id.* (citations omitted). Instead, it adopted a "highly realistic" standard which recognizes that a contract is "ordinarily but an intermediate step" in a process that begins with negotiations and contemplates future consequences that are the "real object" of the transaction. *Id.* (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316 (1943)). As a result, a court must evaluate the whole timeline of the contract when evaluating whether a defendant purposefully established minimum contacts within the forum state. *Id.*

Although the defendant in *Burger King* had only visited Florida once (for a franchisee training course), the Court found the franchise dispute grew directly out of a contract that had a

"substantial connection" with Florida. *Id.* at 479 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). The defendant could have operated an independent local enterprise, but he did not. Rather, he hitched his wagon to a nationwide organization, and entered into a "carefully structured 20-year relationship that envisioned continuing and wide-reaching contracts with Burger King in Florida." *Id.* at 479-80.

Notably, the franchise agreement also included a forum-selection clause, providing that all disputes would be governed by Florida law. *Id.* at 481. Although the forum-selection clause standing alone would be insufficient to confer jurisdiction, it reinforced a relationship the defendant had already established with the Florida headquarters, and made the likelihood of litigation in Florida foreseeable. *Id.* at 482. For these reasons, the Court upheld the Florida district court's exercise of jurisdiction over the defendant. *Id.* at 487.

### ii. *CompuServe*

In *CompuServe, Inc. v. Patterson*, the Sixth Circuit defined the reach of *Burger King* in a new online context. *See* 89 F.3d 1257 (6th Cir. 1996). The Ohio-based plaintiff, CompuServe, operated an "electronic conduit" that provided subscribers with computer software originating either from CompuServe itself or from third parties. *Id.* at 1260. Essentially, CompuServe acted as a matchmaker for people who made software ("providers"), and the subscribers who used that software ("end users"). CompuServe stored the software at its servers in Ohio, and made money by cutting for itself a 15% slice of the provider's licensing fee. *Id.* at 1260-61.

In late 1993, a Texas-based software provider alleged, in a letter sent to CompuServe in Ohio, that his trademarks were being infringed. *Id.* at 1261. After the provider demanded money to settle the claims, CompuServe filed a declaratory judgment action in Ohio against the provider,

seeking a declaration that it had not infringed on any of the trademarks, and that it was not other-wise guilty of unfair or deceptive trade practices. *Id.*

The district court granted the defendant's motion to dismiss for lack of jurisdiction, and CompuServe appealed, presenting a question of first impression for the Sixth Circuit. *Id.* Namely, when the defendant's contacts with the forum state are almost entirely electronic in nature, are these contacts sufficient to support an exercise of personal jurisdiction over the defendant? *Id.* at 1262. This question led the court directly to the issue of whether the defendant's actions had created a "substantial connection" in the forum state that would satisfy the purposeful availment standard laid out in *Burger King*. *Id.* at 1263.

There was "no question" that the defendant had taken actions to create a connection with Ohio: He subscribed to CompuServe, headquartered in Ohio; entered into a contract (governed by Ohio law) when he loaded his software on CompuServe's Ohio-based system; repeatedly sent his software to the Ohio-based system; advertised that software to end users from the Ohio-based system; and to top it off, initiated the trademark dispute by making demands of CompuServe by sending both e-mail and regular mail to Ohio. *Id.* at 1264.

The issue was whether those connections were so substantial that the defendant should have reasonably anticipated being haled into an Ohio court. *Id.* at 1265. To the court, the most salient factor was the defendant's choice to transmit his software to the Ohio-based system, through which he could advertise and sell his software to myriad users. *Id.* Further, the defendant repeatedly sent software to the Ohio-based system for about three years, which created an "ongoing marketing relationship" with CompuServe. *Id.* Because the defendant had initiated a substantial connection with the forum state, and acquired a continuing obligation in the forum state, the court found the defendant had ample contacts to support an assertion of jurisdiction. *Id.*

8

To reach this conclusion, the court considered whether the case was closer to *Burger King*, or to two cases considered by the district court where jurisdiction was not deemed appropriate, *Reynolds v. Int'l Amateur Athl. Fed'n*, 23 F.3d 1110 (6th Cir. 1994) and *Health Communications, Inc. v. Mariner Corp.*, 860 F.2d 460 (D.C. Cir. 1988). *CompuServe*, 89 F.3d at 1264. The facts of *Health Communications* (and their contrast to *CompuServe*) merit discussion.

### iii. *Health Communications*

The plaintiff, Health Communications, Inc., was a Washington D.C. company that marketed and administered a program which taught service industry employees how to recognize the signs of alcohol abuse. The program was well-regarded, and firms around the country would contract with Health Communications so their employees could participate in its training. *Health Communications*, 860 F.2d at 461. The defendant, Mariner Corp., was headquartered in Texas and operated hotels in five states, but did not do business in Washington, D.C. *Id.* Mariner and Health Communications entered into a contract—which did not have a choice of law or forum-selection clause—where Health Communications agreed to train Mariner's employees. *Id.* A total of thirty-six Mariner employees participated in one of four workshops at locations around the country—none of these workshops took place in D.C. *Id.*

In addition, some Mariner employees were certified to train other Mariner employees; these employees were required to follow procedures outlined in manuals obtained from Health Communications's D.C. office. *Id.* Health Communications graded the examination papers of Mariner employees at its D.C. office and from there issued certificates to those who had passed. *Id.* Health Communications also sent Mariner periodic reports listing all Mariner employees who had received TIPS training, and sent Mariner trainers a quarterly newsletter and other communications, all originating from the D.C. office. *Id.*

A dispute arose, and Health Communications sued Mariner in D.C., alleging that Mariner had not paid for the services Health Communications provided in breach of the parties' contract. *Id.* at 462. The district court decided it did not have personal jurisdiction over Mariner, finding the "few acts" performed by Health Communications from its location in D.C. were mainly "ministerial and administrative." *Id.* On appeal, Health Communications analogized the case to *Burger King*, arguing that by contacting Health Communications in D.C. and entering into a contract, Mariner purposefully availed itself of jurisdiction in D.C. *Id.*

The D.C. Circuit disagreed and upheld the district court's decision, finding the business relationship between the franchisor and franchisee in *Burger King* was "markedly different from that between [Health Communications] and Mariner." *Id.* at 463. In *Burger King*, the Michigan franchisee submitted to "exacting regulation of virtually every conceivable aspect of [its] operations." *Id.* (quoting *Burger King*, 471 U.S. at 464). "In effect, the franchise agreement in *Burger King* accomplished a virtual integration of the parties' businesses[,]" and the franchisee "lacked any identity apart from the *Burger King* chain." *Id.* The franchisee had also submitted "expressly and willingly" to Florida law in the franchise agreement. *Id.*

The parties in *Health Communications* were not wedded in such a manner—rather, the relationship was "narrowly specialized." *Id.* "Put most extravagantly, [Health Communications] exercise[d] indirect control" over the conduct of training sessions. *Id.* at 463-64. Unlike *Burger King*, this indirect control did not "affect" or "define" the character of Mariner's business. *Id.* The court concluded that "a purchaser who selects an out-of-state seller's goods or services based on their economic merit does not thereby purposefully avail itself of the seller state's law." *Id.* at 465.

In *CompuServe*, the court found the business relationship more similar to *Burger King* than *Health Communications*, and thus found the defendant had the requisite minimum contacts with

the Ohio party on that basis. *CompuServe*, 89 F.3d at 1264. For "[u]nlike the nonresident defendant in *Health Communications*, [the defendant in *CompuServe*] was far more than a purchaser of services; he was a third-party provider of software who used CompuServe, which is located in Columbus, to market his wares in Ohio and elsewhere." *Id.*

In this case, Defendant is more similar to the hotel company in *Health Communications* than he is to the software provider in *CompuServe*.

Plaintiff is a "highly regarded financial commentator and author" who appears on national television and writes an investing blog [D. 2, ¶ 6]. Defendant had no prior relationship with Plaintiff, but knowing of his financial expertise, it contacted him where he happened to live—Chattanooga—for help in a "nationwide search" with the specific purpose of raising funds to conduct testing of Defendant's burgeoning technology [D. 15, p. 5]. The parties did meet once in Tennessee. Mr. Suntych, Defendant's COO, spent the night in Chattanooga before a meeting with Koch Foods and had dinner with Plaintiff (where they discussed business). But Plaintiff does not show that Koch Foods was headquartered in Tennessee, or that a potential investment from Koch Foods would have any consequences in Tennessee.[3]

Otherwise, many of the factors that created a "substantial connection" and "continuing obligation" with the forum state in *Burger King* and *CompuServe* are simply not present here. For one, there was no written contract,[4] and thus no choice of law or forum selection clause. Unlike

---

[3] In his affidavit, Plaintiff says that two associates from Koch Foods, one of whom is located in Chattanooga, will testify. But this does not establish that Koch Foods is headquartered in Tennessee, or that an investment from Koch Foods would have far-reaching consequences in Tennessee, which is what matters here.

[4] There is a non-disclosure agreement, but Plaintiff is not alleging this agreement was breached (and even if he were, the NDA provides for venue in Colorado, not Tennessee) [D. 17-3, ¶ 13].

*Burger King*, there was no planned "integration" of the businesses. Unlike *CompuServe*, Tennessee was not a "conduit" for Defendant's business. The service provided here was highly specific and limited in both time and scope, as it was in *Health Communications*.

Not only is this case factually similar to *Health Communications*, it raises similar policy concerns. In that case, the court found that if it ruled in the plaintiff's favor, it would be "hard to imagine that anyone entering into a contract for the provision of good or services by an out-of-state party could avoid being haled into court in the seller's forum." *Health Communications*, 860 F.2d at 463. Likewise, if the Court asserted jurisdiction over Defendant in this case, it would allow Plaintiff to use the Tennessee courts as a flytrap that would ensnare anyone who engages him for the provision of financial services, even where the defendant has no prior connection with Tennessee, and no intent to undertake continuing obligations within Tennessee.

### iv. *Cole* and *CapitalPlus*

In his motion, Plaintiff points the Court to another Sixth Circuit decision where the court found the assertion of personal jurisdiction was appropriate. *See Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998). In that case, the plaintiff and defendant had been business associates in Cleveland during the 1970's. *Id.* at 435. The defendant moved to California in 1979 and became a movie producer, and in 1983, organized a California corporation to purchase and distribute a film he had co-produced. *Id.* His former business associate, who still lived in Ohio, purchased stock in the corporation, lent it money, and became one of its officers and directors. *Id.* He also secured a loan from a bank in Baltimore to fund his investment in the corporation. *Id.*

The film did not succeed, and the movie producer offered to buy out his former associate in exchange for the associate's resignation. *Id.* Communicating by letter and telephone from the comfort of their home states, the two parties executed a surety agreement (signed by the defendant

in California and executed by the plaintiff in Ohio) to transfer all the stock and indebtedness to the California-based producer. *Id.* The debts were not repaid by the producer in a timely manner, and the former associate, hounded by creditors, sued on the surety agreement in Ohio. *Id.*

Plaintiff contends that, under *Cole*, the mere transaction of business over the telephone and through written correspondence amounts to "purposeful availment" [D. 15, pp. 6-7]. But the body of Sixth Circuit case law shows that while telephone calls and written correspondence are indeed relevant factors to consider, they are certainly not dispositive factors. *See, e.g.*, *Neal v. Janssen*, 270 F.3d 328 (6th Cir. 2001) ("The acts of making phone calls and sending facsimiles into the forum, standing alone, *may be sufficient* to confer jurisdiction on the defendant where the phone calls and faxes form the bases for the action") (emphasis added); *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 151 (6th Cir. 1997) ("It is immaterial that [defendant] placed telephone calls and sent faxes to [plaintiff] in Michigan"); *LAK*, 885 F.2d at 1301 ("The telephone calls and letters on which the plaintiff's claim of jurisdiction primarily depends strike us as precisely the sort of 'random,' 'fortuitous' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions").

As discussed, when evaluating personal jurisdiction, "mechanical" rules should not be applied. *Burger King*, 471 U.S. at 478. Instead, the whole life of the contract, from prior negotiations to future consequences, should be considered when evaluating whether a defendant purposefully availed herself in a given case. *Id.* In *Cole*, the surety agreement arose from the Ohio plaintiff's involvement in the production company as a corporate officer. By soliciting investment and ceding some control of his production company to the Ohio plaintiff, the defendant developed a business relationship with the plaintiff that made future suit in Ohio foreseeable if a dispute arose.

Here, again, the parties had no prior business relationship, and their existing relationship did not approach the "integration" the Court observed in *Burger King* or *Cole*. *See Matrix Essentials, Inc. v. Harmon Stores, Inc.*, 205 F. Supp. 2d 779, 789 (N.D. Ohio 2001) ("Perhaps the most distinguishing fact of *Cole* and the present case is that the disputed contract in *Cole*...arose out of a pre-existing business relationship between the plaintiff and defendant").

Plaintiff also cites a recent case of ours, which relies in part on *Cole*. *See CapitalPlus Equity, LLC v. Tutor Perini Bldg. Corp.*, No. 3:17-CV-51, 2017 WL 5586663 (E.D. Tenn. Nov. 20, 2017). In *CapitalPlus*, the plaintiff, a Tennessee lender, had negotiated a letter of credit and escrow agreement with an Arizona corporation. *Id.* at *1. This Court found the Arizona defendant had purposefully availed itself of the Tennessee forum, and noted in support of its finding that the contracts had been negotiated via telephone and letters to a Tennessee resident. *Id.* at *4.

Yet that was far from the only factor weighing in the plaintiff's favor. We also considered it "particularly important" that the defendant had created continuing obligations in the state, by negotiating contracts which carried mutual obligations for each party in Tennessee. *Id.* There was also a written contract with a Tennessee choice of law clause, and a term that required any request for payment to be presented at the plaintiff's Knoxville office. *Id.* These factors made it "reasonably foreseeable" that the defendant would be haled into Tennessee in the event of a dispute. *Id.*

Again, the facts here are different. There was no written contract, much less one with a choice of law clause, nor does the alleged oral contract impose any continuing obligation on Defendant in Tennessee. While phone calls and e-mails are relevant in both cases, the robust set of facts that led to the assertion of personal jurisdiction in *CapitalPlus* do not appear here.

### c. Conclusion

To ensure its exercise of jurisdiction is constitutional, a court may only assert personal jurisdiction over a defendant if the defendant has sufficient "minimum contacts" with the forum state. Where the exercise of jurisdiction over the defendant is "specific" to the facts of the case (as it is here), it is "essential" for the defendant to "purposefully avail" herself of the forum state's privileges. When the dispute arises from a contract, this means the defendant must have developed substantial connections with the forum state in negotiating or performing the contract, or that she has agreed to continuing obligations in the forum state as part of the contract. The court should pay attention to the quality, rather than the quantity, of the forum state contacts.

The Court finds that while Defendant developed some connections to Tennessee in the course of negotiating the contract, these connections were not substantial enough to make an exercise of jurisdiction constitutionally appropriate. Nor did Defendant agree to any continuing obligations within Tennessee that made an exercise of jurisdiction foreseeable.

For these reasons, the Court finds it cannot exercise personal jurisdiction within the boundaries set by the due process clause of the Fourteenth Amendment. It now must decide whether this case should be dismissed, or transferred to a venue where jurisdiction can be exercised.

## V. VENUE

Defendant had argued, in the alternative, for transferring this case to the District of Colorado under 28 U.S.C. § 1404(a) [D. 13, ¶ 3]. Because its motion has been granted, the request for transfer under § 1404(a) is moot. But another venue transfer provision does apply.

28 U.S.C. § 1631 provides that when a court finds there is a "want of jurisdiction," it shall transfer a case to any other court in which the case could have been brought, so long as the transfer "is in the interest of justice." In the Sixth Circuit, § 1631 may be invoked when the court finds

either subject matter or personal jurisdiction is lacking. *Roman v. Ashcroft*, 340 F.3d 314, 328 (6th Cir. 2003). A transfer under § 1631 does not require a motion from either party, and the decision to transfer is committed to the district court's discretion. *See LGT Enterprises, LLC v. Hoffman*, 614 F. Supp. 2d 825, 842-43 (E.D. Mich. 2009) (transferring case *sua sponte*, finding "generally, transfer is favored over a dismissal because a transfer facilitates the adjudication of a dispute on the merits") (citations omitted); *see also Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103, 112 n. 4 (D.D.C. 2008) (in the D.C. Circuit "*sua sponte* transfers pursuant to [§ 1631] are committed to the discretion of the District Court where no party has moved to transfer a case brought in the wrong jurisdiction").

To transfer the case there must be another court that would have jurisdiction. Here, Defendant has already conceded that jurisdiction would lie in Colorado, and the Court agrees [*see* D. 14, p. 11]. For a corporation, the "paradigm forum" for the exercise of general jurisdiction is the one in which the corporation is "at home," and is not limited to the state of incorporation. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). The Defendant is headquartered in Colorado, and the principal corporate officers are Colorado residents, so a Colorado court has general jurisdiction over Defendant [D. 1-1, ¶¶ 2-3].

The next consideration is whether transfer would serve the "interests of justice." Dismissing a case will require the plaintiff to incur additional costs in refiling, and may raise statute of limitations issues. So unless a case is brought in bad faith or to harass the defendant, the interests of justice generally favor a decision to transfer, instead of dismiss, a case. *See LGT Enterprises*, 614 F. Supp. 2d at 842; *Roman*, 340 F.3d at 329.

By moving for a transfer of venue in the alternative, Defendant has effectively conceded that the lawsuit has been brought in good faith and that it is worth litigating on the merits. And the

Court, in conducting its own review of the case, does not consider the lawsuit to be frivolous. Thus, a transfer of venue to federal court in Colorado is appropriate under 28 U.S.C. § 1631.

## VI.      CONCLUSION

For the reasons given, Defendant's motion to dismiss [D. 13] for lack of personal jurisdiction is **GRANTED**. Rather than dismissing this case outright, it is instead **TRANSFERRED** to the U.S. District Court for the District of Colorado in accordance with the Court's authority under 28 U.S.C. § 1631. The motion to allow a sur-reply [D. 20] is also **DENIED**, and the Court has not considered the briefs accompanying this motion in reaching its decision.

**IT IS SO ORDERED.**

_____
**CHIEF UNITED STATES DISTRICT JUDGE**

17